**Opinion filed September 19, 2024**



## In The

# Eleventh Court of Appeals

_____

### No. 11-23-00174-CV

_____

### MICHAEL BOUCHER, Appellant

### V.

### WARRIOR CRANE SERVICE, LLC, Appellee

**On Appeal from the 385th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV58950**

### O P I N I O N

This is an accelerated appeal from the trial court's denial of a motion to compel arbitration.[1]  *See* CIV. PRAC. & REM. § 51.016 (West 2015), § 171.098(a)(1) (West 2019); TEX. R. APP. P. 28.1(a).  Appellee, Warrior Crane Service, LLC, sued

---

[1]Appellant asserts that the Federal Arbitration Act (FAA) governs the arbitration provision at issue and thus brings this appeal under Section 51.016 of the Texas Civil Practice and Remedies Code.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016; *see* 9 U.S.C. § 16.

Appellant, Michael Boucher, a former employee, for breach of his employment agreement. Boucher moved to compel arbitration of the claims that Warrior asserted against him based on an arbitration clause contained in Warrior's employee handbook. The trial court denied Boucher's motion. In a single issue on appeal, Boucher submits that the trial court erred when it denied his motion because (1) the parties agreed to arbitration and (2) the claims that Warrior brought against him "are within the broad scope of the arbitration agreement." We affirm.

## I. *Background*

Boucher was employed by Warrior as its Chief Operating Officer pursuant to an employment agreement signed by the parties; his employment began in February 2021. Although Boucher's employment with Warrior was "at-will," the employment agreement set forth certain terms of his employment. These terms included Boucher's promise to "comply with the policies and procedures of [Warrior] made known to Employee in writing and in effect from time to time." Another term provided that Boucher could be terminated for cause because of his failure or refusal to "abide by and comply with [Warrior's] written policies and procedures (including those contained in any of [Warrior's] policy manuals, as such may be amended from time to time)." The employment agreement contained other provisions that applied to Boucher, namely (1) a covenant not to compete with Warrior's business, (2) a non-solicitation clause, and (3) a confidentiality clause that required Boucher to protect Warrior's trade secrets. It decreed that the agreement itself "constitutes the entire agreement of the parties" and that "no agreement . . . relating to [Boucher's] employment . . . that is not contained in this Agreement shall be valid or binding." It also mandated that "[a]ny modification of this Agreement will be effective only if it is in writing and signed by each party" and approved by Warrior.

2

Soon after his employment agreement was executed, Boucher received an employee handbook from Warrior, which set forth many of Warrior's policies and procedures. The first page of the handbook contains an introduction to Warrior, the first paragraph of which states: "The policies and procedures in this manual are not intended to be contractual commitments by [Warrior], and employees shall not construe them as such. They are intended to be guides to management and merely descriptive of suggested procedures to be followed." The next paragraph of the introduction states that Warrior "reserves the right to revoke, change, or supplement these guidelines at any time without notice. Such changes shall be effective immediately upon approval by management unless otherwise stated." The following section of the handbook concerns Warrior's "employment at-will" policy and reiterates that the "[p]olicies set forth in this handbook are not intended to create a contract, nor are they to be constructed to constitute contractual obligations of any kind or a contract of employment between [Warrior] and any of its employees." All of the above statements are located on the first page of the handbook.

The handbook also contains a dispute resolution clause, which purports to mandate the arbitration of employee disputes. The clause states in full:

> Any dispute or claim that arises out of, or that relates to employment with [Warrior], or that arises out of, or that is based on the employment relationship (including any wage claim, any claim for wrongful termination, or any claim based on employment discrimination or civil rights statute, regulation or law), including tort or harassment claims (except a tort that is a "compensable injury" under workers' compensation law), shall be resolved by arbitration in accordance with the then effective commercial arbitration rules of the American Arbitration Association by filing a claim in accordance with the Association's filing rules, and judgment on the award rendered pursuant to such arbitration may be entered in any court having jurisdiction thereof.

3

Attached to the handbook is an appendix that contains a single document entitled "Acknowledgement of Receipt of Employee Handbook." The acknowledgement recites that the signatory employee agrees to and will comply with the policies, procedures, and other guidelines set forth in the handbook and that he understands that Warrior reserves the right to change, modify, or abolish any of the handbook's policies and procedures at any time, without notice. It also states that the employee "acknowledge[s] that neither the handbook nor its contents are an express or implied contract regarding [their] employment."

Boucher left Warrior sometime in August or September 2022 and thereafter began working for TNT Crane & Rigging, Inc., a direct competitor to Warrior. After he left Warrior's employ, Boucher filed a claim for unpaid wages and vacation pay with the Texas Workforce Commission (TWC). The TWC held a telephonic hearing on Boucher's claim and, during the hearing, the hearing officer inquired of both parties whether Boucher's wage claim was subject to the arbitration clause set forth in Warrior's employee handbook. Warrior's representative deferred to its counsel to answer that question, and counsel responded:

> I would represent for the hearing that we believe that the arbitration clause does apply, but we do not intend at this time to invoke the arbitration provision.
> . . . .
> The employer does enforce [the policies and procedures set forth in the employee handbook], I think the issue is this becomes a little bit more complicated than just a yes or no . . . I think there are some legal questions about the arbitration provision, and even whether they're enforceable right now or not. I think our client's position is this arbitration is valid. [Boucher] signed the arbitration provision, and that he was required to go through arbitration prior to filing this particular type of claim.

After this inquiry and subsequent discussion, the hearing officer concluded that, because of the arbitration clause, the TWC did not have jurisdiction over Boucher's

wage claim and terminated the hearing on that basis. Later, the TWC issued a written decision memorializing the hearing officer's conclusion that the TWC "will not take jurisdiction over the claimant's wage claim because an agreement between the parties provides that arbitration shall be the sole method of resolving disputes."

Sometime after Boucher filed his wage claim with the TWC, Warrior sued him in the 385th District Court of Midland County for violations of his post-employment obligations as set forth in his employment agreement—namely, by working for a direct competitor of Warrior in violation of the covenant not to compete and soliciting other Warrior customers, potential customers, and employees to leave Warrior, in violation of the non-solicitation clause. In its pleading, Warrior sought temporary and permanent injunctive relief against and monetary damages from Boucher. In the same pleading, Warrior also sued TNT for tortious interference of the parties' employment agreement. Boucher filed an answer, and the parties later negotiated and agreed to the entry of a permanent injunction, which addressed Warrior's request for permanent injunctive relief.

Boucher subsequently moved to compel Warrior to arbitrate its remaining claims pursuant to the arbitration clause set forth in the employee handbook. Warrior opposed arbitration and argued that (1) it did not sign an agreement to arbitrate, (2) the employee *handbook* is not and does not create a contract between the parties, and (3) the employment *agreement* is a binding contract and mandates that the parties litigate any disputes related to the agreement in an appropriate court in Midland County. In response, Boucher averred that Warrior had represented before the TWC that the arbitration clause was valid and enforceable, and that this representation directly resulted in the TWC's dismissal of Boucher's wage claim in favor of the parties' agreement to arbitrate certain claims. Boucher also asserted that

5

the arbitration clause constituted an agreement to arbitrate, notwithstanding the employee handbook's disclaimer that it did not create any contractual obligations.

After a hearing on Boucher's motion to compel arbitration, the trial court denied the motion. This appeal followed.

## II. *Standard of Review*

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion.[2] *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018). We defer to the trial court's factual determinations if they are supported by evidence, but we review the trial court's legal determinations de novo. *Id.* If the trial court does not issue findings of fact and conclusions of law with its ruling, all facts necessary to support the trial court's judgment and which are supported by the evidence are implied. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

Under both the TGAA and the FAA, a party that seeks to compel arbitration must establish (1) the existence of a valid arbitration clause, and (2) that the claims in dispute fall within the scope of the parties' agreement. *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013) (TGAA); *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (FAA); *see* 9 U.S.C. §§ 2, 4; Civ. Prac. & Rem. §§ 171.001–.002, 171.021. Whether an arbitration clause is valid and enforceable is a question of law that we review de novo. *See Rachal*, 403 S.W.3d at 843; *J.M. Davidson, Inc. v. Webster*,

---

[2]Although Boucher asserts that the FAA governs the arbitration clause at issue, the clause itself does not invoke either the FAA or the Texas General Arbitration Act (TGAA). *See* 9 U.S.C. § 2; Civ. Prac. & Rem. § 171.002. Warrior cites to authorities concerning each Act but does not specifically address which Act it claims governs in this instance. As for the issue raised on appeal and the arguments presented by the parties, our analysis is the same under either statute. *See Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 97 n.64 (Tex. 2011) ("The T[G]AA and the FAA may both be applicable to an agreement, absent the parties' choice of one or the other.") (citing *In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127–28 (Tex. 1999) (per curiam)).

128 S.W.3d 223, 227 (Tex. 2003). Likewise, we review de novo whether a claim falls within the scope of a valid arbitration agreement. *Henry*, 551 S.W.3d at 115.

Whether parties have agreed to arbitrate is a gateway matter that is ordinarily committed to the trial court and subject to applicable state law that governs "the validity, revocability, and enforceability of contracts generally." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018) (quoting *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009)); *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130–31 (Tex. 2005). Thus, ordinary principles of contract law of the forum state determine whether the parties have a valid agreement to arbitrate. *Rubiola*, 334 S.W.3d at 224.

Once the party seeking to compel arbitration proves the existence of an enforceable agreement to arbitrate, there is a strong presumption in favor of arbitration. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 521 (Tex. 2015). However, this presumption arises only after a valid agreement has been established. *Id.*; *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 499–500 (Tex. 2015). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Henry*, 551 S.W.3d at 115 (quoting *In re Serv. Corp. Intern.*, 85 S.W.3d 171, 174 (Tex. 2002)).

### III. *Analysis*

#### A. *Estoppel Arguments*

In support of his contention that an enforceable agreement to arbitrate exists, Boucher contends that Warrior expressly accepted the benefits of the arbitration clause through the arguments it presented to the TWC in contesting Boucher's wage claim, and it, therefore, cannot now assert a position that is inconsistent with its prior

arguments. We view the substance of this contention as, essentially, that judicial estoppel or quasi-estoppel apply and should preclude Warrior from now advancing an inconsistent position. *See George Fleming and Fleming & Assocs., L.L.P. v. Wilson*, No. 22-0166, 2024 WL 2226290, at *5 (Tex. May 17, 2024) (holding that although the plaintiffs did not use the phrase "judicial estoppel," they said more than enough to put the defendant on notice of their contention that the defendant's prior inconsistent statements should preclude him from seeking relief, and that courts generally accord relief to litigants based on substance rather than form so long as the pleadings provide sufficient notice to the opposing party to enable that party to prepare a defense or a response) (citing *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017)).

Generally, judicial estoppel is "a common law doctrine that prevents a party from [asserting] inconsistent positions in litigation." *Id.* at *3 (quoting *Perryman v. Spartan Tex. Six Cap. Partners, Ltd.*, 546 S.W.3d 110, 117 (Tex. 2018)). It "precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage." *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009) (citing *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008)). "The doctrine is not strictly speaking estoppel, but rather is a rule of procedure based on justice and sound public policy." *Pleasant Glade Assembly of God*, 264 S.W.3d at 6 (citing *Long v. Knox*, 291 S.W.2d 292, 295 (Tex. 1956)). Judicial estoppel is not intended "to punish inadvertent omissions or inconsistencies but rather to prevent parties from playing fast and loose with the judicial system for their own benefit." *Banta Oilfield Servs., Inc. v. Mewbourne Oil Co.*, 568 S.W.3d 692, 701 (Tex. App.—Texarkana 2018, pet. denied) (quoting *Ferguson*, 295 S.W.3d at 643). Rather, it "target[s] circumstances where a 'party has succeeded in

8

persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.'" *George Fleming*, 2024 WL 2226290, at *3 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

For judicial estoppel to apply, a party must show that "(1) the opposing party made a sworn, inconsistent statement in a prior judicial proceeding; (2) the opposing party making the statement gained some advantage by it; (3) the statement was not made inadvertently or because of mistake, fraud, or duress; and (4) the statement was deliberate, clear, and unequivocal."[3] *See Banta Oilfield Servs.*, 568 S.W.3d at 701 (quoting *Galley v. Apollo Associated Servs., Ltd.*, 177 S.W.3d 523, 528–29 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (footnote omitted)); *see also New Hampshire*, 532 U.S. at 750–53; *Swilley v. McCain*, 374 S.W.2d 871, 875–76 (Tex. 1964); *Long*, 291 S.W.2d at 295.

Here, Boucher has not established that Warrior's conduct satisfies the first and fourth estoppel factors above. As for the first factor, there were no statements made under oath by Warrior's representative or counsel at the TWC hearing concerning the arbitration clause. Further, the TWC hearing was an administrative proceeding, not a judicial proceeding. As for the fourth factor, the statements made by Warrior's counsel (quoted above) at the TWC hearing were far from deliberate, clear, and unequivocal: "I think our client's position is this arbitration is valid." Counsel equivocated and even raised the question of the arbitration clause's enforceability himself during the hearing: "I think there are some legal questions about the arbitration [clause], and even whether they're enforceable right now or not."

---

[3]Some courts have held that the doctrine may apply not only to the sworn statements of witnesses, but also to "the statements of attorneys explaining their client's position in the litigation." *Banta Oilfield Servs.*, 568 S.W.3d at 704 (quoting *Webb v. City of Dallas*, 211 S.W.3d 808, 820 (Tex. App.—Dallas 2006, pet. denied)).

Moreover, counsel qualified that although, "for the hearing," he believed Warrior's position was that the arbitration clause was valid, he stated "we do not intend at this time to invoke the arbitration [clause]." Regardless of the hearing officer's decision about the enforceability of the arbitration clause, counsel's isolated statement that he "thought" the arbitration clause is valid and enforceable—which counsel later retracted—cannot be said to have been "deliberate, clear, and unequivocal." Therefore, judicial estoppel does not apply.

Nor does quasi-estoppel. Quasi-estoppel is an affirmative defense that "precludes a party from asserting, to another's disadvantage, a right [that is] inconsistent with a position previously taken." *Rahlek, Ltd. v. Wells*, 587 S.W.3d 57, 73 (Tex. App.—Eastland 2019, pet. denied) (quoting *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 778 (Tex. 2017)). This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which he acquiesced or by which that party accepted a benefit. *Id.*; *In re Estate of Webb*, 266 S.W.3d 544, 552 (Tex. App.—Fort Worth 2008, pet. denied). "However, before the acceptance of benefits can trigger [quasi-]estoppel, it must be shown that the benefits were accepted with knowledge of all material facts." *Banta Oilfield Servs.*, 568 S.W.3d at 706 (quoting *Nash v. Beckett*, 365 S.W.3d 131, 144 (Tex. App.—Texarkana 2012, pet. denied)).

To the extent that Boucher relies on either or both theories, neither can save him on appeal. As we have discussed, the statements made by Warrior before the TWC were not made under oath or during a judicial proceeding. Further, counsel's statements were noncommittal and equivocal, and he even expressed doubts about the enforceability of the arbitration clause. Indeed, this is not a situation in which Warrior accepted the benefits of an alleged contractual provision with full knowledge of all material facts.

B. *The Arbitration Clause is not a Contract*

Here, Boucher's primary argument is that the arbitration clause satisfies all the elements of contract formation and, therefore, it is binding on Warrior notwithstanding the disclaimers to the contrary in the employee handbook. Specifically, Boucher asserts that the arbitration clause constitutes a binding contract between the parties because (1) the parties' mutual promise to arbitrate is sufficient consideration, (2) Warrior made the arbitration clause a condition of Boucher's employment, and (3) he manifested his acceptance of the arbitration clause when he acknowledged receipt of it and continued working for Warrior for a significant time after receiving it. Warrior responds that the arbitration clause is not a contract at all, and thus not binding on the parties, because (1) it did not sign any arbitration agreement, (2) the employee handbook clearly precludes construing its terms as creating any contractual obligations, (3) sufficient consideration does not exist, (4) any promises in the employee handbook are illusory, and (5) Boucher's separate employment agreement is controlling, does not contain an arbitration agreement, and has not been validly modified.

We conclude that the arbitration clause upon which Boucher relies is not a binding contract as he suggests because (1) the language of the employee *handbook* and the clause itself clearly establishes that the parties did not mutually agree to arbitrate, and (2) there is insufficient consideration for a binding agreement.

"Arbitration agreements are interpreted under traditional contract principles." *In re Whataburger Restaurants LLC*, 645 S.W.3d 188, 194 (Tex. 2022) (quoting *J.M. Davidson*, 128 S.W.3d at 227). The plain language of the agreement controls. *Wagner v. Apache Corp.*, 627 S.W.3d 277, 285 (Tex. 2021). "Words must be construed 'in the context in which they are used.'" *Sundown Energy LP v. HJSA No.3, L.P.*, 622 S.W.3d 884, 888 (Tex. 2021) (quoting *URI, Inc. v. Kleberg Cnty.*,

11

543 S.W.3d 755, 764 (Tex. 2018)). In this regard, we examine the entire text to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Whataburger*, 645 S.W.3d at 195 (citing *J.M. Davidson*, 128 S.W.3d at 229).

The employee *handbook* clearly provides that the handbook is not a contract and does not create any contractual obligations. Further, the arbitration clause in the handbook is subject to the handbook's disclaimers. Although some courts have held that arbitration clauses in employee handbooks can constitute binding agreements—notwithstanding language in the handbooks that disclaim the creation of any contractual obligations—*this* handbook and arbitration clause do not resemble the documents that were examined and construed in those decisions. *See, e.g.*, *Whataburger*, 645 S.W.3d at 191.

For example, in *Whataburger*, the employee handbook contained an arbitration clause, the receipt of which the employee had acknowledged by signing a one-page acknowledgement sheet. *Id.* As in the case before us, the acknowledgement sheet confirmed that the employee handbook was intended for use as a guide only, was not to be construed as a contract, and could be revoked by Whataburger at any time without notice. *Id.* The arbitration clause in the handbook explicitly stated that the acceptance of employment or continuation of employment after the receipt of the handbook constituted an employee's consent to the arbitration clause. *Id.* It also provided that Whataburger would have no right to unilaterally amend or modify the clause without the mutual consent of the parties. *Id.* The Texas Supreme Court held that the arbitration clause was binding on the parties because, although it was contained in the employee handbook, the clause did not reference or incorporate the handbook's other provisions. *Id.* at 196. Further, the handbook's introductory language distinguished between the clause and the rest of the

12

handbook's provisions and made clear that the clause was an exception to the general rule that the handbook was merely a guide subject to unilateral revision by Whataburger. *Id.* The court also noted that the acknowledgment sheet recited and identified the documents the employee was provided and listed the clause separately from the handbook. *Id.*

In *J.M. Davidson, Inc. v. Webster*, the court held that an arbitration agreement was ambiguous because the agreement, a one-page document, merely stated that the parties "mutually agree and contract that any and all claims, disputes or controversies . . . [would] be exclusively and finally settled by binding arbitration." *J.M. Davidson*, 128 S.W.3d at 225. No other language in the document addressed the employer's ability to modify the arbitration agreement specifically, although a sentence at the end of the document stated that the employer reserved the right to unilaterally abolish or modify any personnel policy without prior notice. *Id.* at 226. The court further held that the arbitration agreement was ambiguous because it was unclear as to whether the employer's unilateral right to abolish or modify personnel policies also included the arbitration agreement. *Id.* at 229.

In this case, the arbitration clause is not ambiguous. Nor are any of the dispositive features from *Whataburger* present in Warrior's employee handbook and arbitration clause. Neither the employee handbook nor the acknowledgement sheet distinguishes the arbitration clause separately from the handbook. The language in the handbook that disclaims the creation of any contractual obligations between the parties contains no exceptions or qualifiers for the arbitration clause, or any other procedure or policy. In the absence of these and any other distinguishing language, the text of the handbook as well as the arbitration clause subject the clause to the same disclaimers which apply to the remaining policies and procedures that are contained in the *handbook*. Thus, according to the plain language of the employee

13

handbook and the arbitration clause contained therein, we conclude that the parties did not mutually agree to arbitrate. *See Young Men's Christian Ass'n of Greater El Paso v. Garcia*, 361 S.W.3d 123, 127 (Tex. App.—El Paso 2011, no pet.) (holding that, considering the disclaimers found in the personnel policy manual, the dispute resolution policy was not a valid arbitration agreement).

Nor is there sufficient consideration for the creation of a binding agreement between the parties. Unlike the employer in *Whataburger*, Warrior is not constrained from unilaterally modifying the arbitration clause at any time and without notice. Thus, the consideration of mutual binding promises to arbitrate that was present in *Whataburger* does not exist here. *See Whataburger*, 645 S.W.3d at 196; *In re Halliburton Co.*, 80 S.W.3d 566, 570 (Tex. 2002) (holding that the employee's "at-will" employment status did not render the arbitration agreement illusory because the employee did not rely on continued employment as consideration but, rather, mutual promises to submit all employment disputes to arbitration was sufficient consideration because both parties were bound to the promise to arbitrate).

Moreover, continued employment alone does not constitute sufficient consideration because an at-will employer retains the right to terminate one's employment at any time and for any reason—a promise of continued employment in such a relationship is an illusory promise. *See Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644–45 (Tex. 1994), *abrogated on other grounds by Marsh USA, Inc. v. Cook*, 354 S.W.3d 764, 773–80 (Tex. 2011); *J.M. Davidson*, 128 S.W.3d at 228. An arbitration clause is illusory if one party can avoid its promise to arbitrate by amending the clause or terminating it all together. *See In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 424 (Tex. 2010) (citing *Halliburton*, 80 S.W.3d at 570). "When illusory promises are all that support a purported bilateral contract, there is

no mutuality of obligation and, therefore, no contract." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). Such is the case here.

Because we have concluded that no valid and enforceable agreement to arbitrate exists, we need not address Appellant's remaining arguments. *See* TEX. R. APP. P. 47.1. We hold that the trial court did not abuse its discretion when it denied Boucher's motion to compel arbitration. Accordingly, we overrule Appellant's sole issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

September 19, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.